**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**


**GENELLIA P. YOAKUM,**

       **Plaintiff,**

**v.**                             **CIVIL ACTION NO.: 1:14-CV-74**
                                     **(JUDGE KEELEY)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

       **Defendant.**


## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

On April 25, 2014, Plaintiff Genellia P. Yoakum ("Plaintiff"), by counsel Brian D. Bailey, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1). On June 30, 2014, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 7; Admin. R., ECF No. 8). On July 15, 2014, and August 13, 2014, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 11; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 13). Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.   PROCEDURAL HISTORY

On July 13 2011, Plaintiff filed her application under Title II of the Social Security Act for a period of disability and disability insurance benefits, alleging disability beginning on February 1, 2011. (R. 126). Plaintiff's earnings record shows that she acquired sufficient quarters of coverage to remain insured through March 31, 2013; therefore, Plaintiff must establish disability on or before this date. (R. 155). Her claim was denied initially on August 29, 2011 (R. 75) and upon reconsideration on October 25, 2011 (R. 86). On November 1, 2011, Plaintiff filed a written request for a hearing (R. 89), which was held before United States Administrative Law Judge ("ALJ") Karen B. Kostol on November 27, 2012 in Morgantown, West Virginia. (R. 28-64). Plaintiff, represented by counsel Harold Bailey, Esq., appeared and testified, as did Timothy E. Mahler, an impartial vocational expert. (R. 29). On November 30, 2012, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 13-24). On April 3, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 2-5).

## III. BACKGROUND

### A.   Personal History

Plaintiff was born on March 30, 1953 and was fifty-seven years old at the time of her alleged onset date. (R. 126). She completed ninth grade, obtained her GED and received no additional or specialized vocational training or education. (R. 35-36). Plaintiff's husband has been disabled since suffering a stroke in 1987. (R. 34). She has no dependent children. (R. 127). Plaintiff has prior work experience as a caregiver from 1996 to 2011, a kitchen aide in a hospital from 2009 to 2010, a kitchen manager at a correctional facility from 2005 to 2006 and a cashier and stock person at a grocery store for six months. (R. 37-42; R. 146). Plaintiff alleges disability

due to pain in her right lumbar area of her back and her right ankle following a motor vehicle accident on February 1, 2011. (R. 158-59).

**B.    Medical History**

**1.    Medical Evidence**

On February 1, 2011, Plaintiff presented to the St. Joseph's Hospital Emergency Room after being involved in a two car T-bone collision. (R. 220). Plaintiff was driving approximately sixty-five miles per hour when she tried to stop to prevent a collision when another car pulled out in front of her. (R. 223, 247). She presented with head, mouth, lower back and left ankle injuries and reported severe pain. (Id.). The physical examination noted an abrasion on Plaintiff's lip, lumbar pain as well as ankle pain and a deformity to the right ankle. (R. 221, 223). Plaintiff's diagnoses were abrasion to lower lip, concussion without loss of consciousness and a lumbosacral sprain/strain. (Id.). She was prescribed Percocet for pain, Flexeril for muscle spasms and Naproxen/Naprosyn, a nonsteroidal anti-inflammatory medicine. (R. 226).

Plaintiff also received a number of CT scans and x-rays while admitted to the ER. The CT of Plaintiff's head was normal. (R. 235). The CT of Plaintiff's chest showed minimal compressive atelectasis slightly greater on the right. (R. 236). The CT of Plaintiff's abdomen (i.e., liver, gallbladder, pancreas, spleen, adrenals and left kidney) was normal. (Id.). The CT of Plaintiff's pelvis was normal. (Id.). The x-rays of Plaintiff's cervical and lumbar spine were normal. (R. 237-38). The x-rays of Plaintiff's right foot, right tibia and fibula were normal. (R. 239-40). The x-ray of Plaintiff's right ankle showed soft tissue swelling over the lateral malleolus and a slight widening of the lateral ankle joint mortise but no fracture. (R. 241).

On February 4, 2011, Plaintiff returned to St. Joseph's Hospital for a follow-up appointment. (R. 247). Plaintiff was ambulating with crutches and reported feeling pain in the

3

low back, right hip and right ankle. (Id.). She had some difficulty moving the right leg at the hip because of the pain in the front of the thigh. (Id.). The physical examination of the right ankle showed swelling in the foot, which Plaintiff said initially started around the ankle. (Id.). There was tenderness mainly around the lateral malleolus, some ecchymosis on the dorsum and lateral aspect of the foot but no significant tenderness in the foot itself. (Id.). The physician also noted that the x-rays of the hip and right ankle were negative. (Id.). The diagnoses included right ankle sprain and right hip strain. (Id.). Plaintiff was given an ankle walker and advised to wear it twenty-four hours a day, to continue using crutches with weight bearing on the right foot as tolerated and to return in about ten days for further x-rays of the ankle, if needed. (Id.).

On February 6, 2011, Plaintiff returned to St. Joseph's Prompt*Care* Department reporting current treatment for a dislocated ankle as well as symptoms of low back pain radiating into her right hip. (R. 250). Plaintiff noted she was prescribed Percocet and Flexeril, which she has not taken because she did not like the way it made her feel. (Id.). The physical examination noted Plaintiff was non-distressed with largely normal findings except for tenderness and spasms in the paraspinal area and that her right ankle was in a leg cast. (Id.). After administration of pain medication, including morphine, Plaintiff reported the pain improved. (R. 251). Her diagnosis was lumbosacral sprain. (Id.). At discharge, Plaintiff's Flexeril prescription was discontinued and replaced with Skelaxin, a muscle relaxant. (Id.).

A back pain/injury record from St. Joseph's Hospital Emergency Room noted Plaintiff reported worsening back pain that was constantly throbbing. (R. 253). The initial assessment listed that Plaintiff was in mild distress and reported pain with range of motion of her back. (Id.).

On February 16, 2011, Plaintiff presented for a follow-up appointment with Dr. Michael Kirk, Plaintiff's primary physician at St. Joseph's Hospital. (R. 259-60). Plaintiff reported

continued low back pain and muscular spasms with some radiation to the legs. (R. 259). She reported no b/b dysfunction or weakness. (Id.). Her medical history included chronic arthritis. (Id.). Her physical examination noted normal demeanor and no acute distress. (R. 260). Her back showed bilateral lumbar paravertebral spasm with no midline tenderness and right sided sacroiliac ("SI") joint tenderness. (Id.). Dr. Kirk was unable to assess range of motion because Plaintiff could not bear weight on her right ankle; she was also using crutches. (Id.). Neurological examination of the leg was intact. (Id.). Plaintiff's medications included Naproxen and Skelaxin. (R. 259). Her problem list included LS strain/sprain and right SI joint sprain. (Id.).

Also on February 16, 2011, Dr. James Kim, another physician at St. Joseph's Hospital, who was specifically treating Plaintiff's ankle sprain ordered an x-ray of Plaintiff's ankle/foot due to reports of pain. (R. 258). The x-ray noted mild soft tissue swelling, no ankle mortise widening and no evidence of fracture. (Id.).

On February 28, 2011, Plaintiff presented for two week follow-up with Dr. Kirk. (R. 267-68). Plaintiff noted she had been going to physical therapy and "feels that she has made modest improvement." (R. 267). Dr. Kirk noted there were no significant new symptoms. (Id.) The physical examination showed that Plaintiff was moving much easier but she still had paravert spasms, especially on the left and the right SI was still tender. (R. 267-68). Her strength was "good." (R. 268). The plan was for Plaintiff to continue physical therapy and her medication, which included Naproxen and Robaxin, a muscle relaxant. (R. 267).

On April 6, 2011, Plaintiff presented for a six week follow-up appointment with Dr. Kirk. (R. 269-70). Plaintiff reported she continued in physical therapy and was making progress but was still having pain in her right low back and buttocks area. (R. 269). She stated she was only using Robaxin when necessary. (Id.). The physical examination showed normal demeanor and no

acute distress and noted that Plaintiff was "moving more comfortably, but cautiously." (Id.). The plan suggested a transcutaneous electrical nerve stimulation ("TENS")[1] trial and continued physical therapy. (R. 270).

On April 13, 2011, Dr. Kim ordered an x-ray of Plaintiff's right ankle due to continued pain. (R. 271). The x-ray showed no apparent fracture or other bony defect, no evidence of dislocation and the ankle joint appeared normal. (Id.).

On May 5, 2011, Plaintiff presented to an appointment with Dr. Kirk for a follow-up on her right SI joint sprain and lumbar strain/sprain. (Id.). Dr. Kirk noted that Plaintiff continued to improve with less spasm but there was "[s]till significant discomfort in SI area." (Id.). The physical examination noted continued improvement in the lumbar spasm but still mildly present as well as tender SI joint. (R. 273). The diagnosis was right SI joint sprain and LS strain/sprain. (Id.). Plaintiff was still taking Robaxin at this time, four times a day as needed. (Id.).

On May 6, 2011, Dr. Kim ordered an MRI of Plaintiff's right ankle due to continued pain and swelling. (R. 275). The MRI showed unremarkable results of the ankle. (Id.).

On June 6, 2011, Plaintiff had a follow-up appointment with Dr. Kirk for her right SI joint strain and lumbar strain/sprain. (R. 276). Plaintiff reported that her right SI joint still gives her pain and limits her activity; for example, she tried caring for a family member and had difficulty with this. (Id.). Her lumbar area was much better and Plaintiff reported no spasms. (Id.). At this time, Plaintiff had been discharged from follow-up care with Dr. Kim for her ankle but was still having pain and limitation of range of motion. (Id.). The physical examination noted

---

[1] TENS treatment is indicated for musculoskeletal pain, neuralgia and peripheral vascular disease. See Alex Moroz, MD, FACP, Rehabilitative Measures for Treatment of Pain and Inflammation, THE MERCK MANUAL (August 2013), http://www.merckmanuals.com. TENS "uses low current at low-frequency oscillation to relieve pain. Patients feel a gentle tingling sensation without increased muscle tension. Depending on the severity of pain, 20 min to a few hours of stimulation may be applied several times daily. Often, patients are taught to use the TENS device and decide when to apply treatment." Id.

lumbar paravertebrals without spasms and no midline tenderness; tender right SI joint and increased pain with standing on right foot; ankle with some limitation of range of motion in dorsiflexion with the ankle itself not tender but tender points in the toe extensors. (R. 277). Dr. Kirk treated Plaintiff with a trigger point injection with one percent Lidocaine to the right toe extensors and Plaintiff stated improvement of ankle pain following the injection. (Id.). Plaintiff's diagnoses included right SI joint sprain and myofasical pain in the right ankle. (R. 278). Dr. Kirk recommend continued stretching/strengthening of the back with a follow-up in two months. (Id.).

On October 6, 2011, Plaintiff presented for a follow-up appointment with Dr. Kirk. (R. 350). Plaintiff reported that the trigger point injections she received one-month prior made her back worse and she developed a headache after them. (Id.). Plaintiff stated she feels "like there is a catch" in the lower back restricting movement. (Id.). Plaintiff noted she had seen a chiropractor for other problems in the past. (Id.). Plaintiff's diagnosis was right SI joint sprain and LS strain/sprain. (R. 351). Dr. Kirk referred Plaintiff to Dr. Lattimer, a chiropractor, and Plaintiff continued her prescription of Robaxin, four times a day as needed. (Id.).

On November 11, 2011, Plaintiff returned for a follow-up appointment with Dr. Kirk and reported that her back pain was not better with treatment from Dr. Lattimer, the chiropractor. (R. 353). Her symptoms and diagnoses remained unchanged. (Id.). Dr. Kirk referred Plaintiff to another round of physical therapy and recommended a follow-up in six weeks. (R. 354).

On December 19, 2011, Plaintiff had her six week follow-up appointment with Dr. Kirk. (R. 356). Plaintiff reported little further improvement with physical therapy and stated that she continues to be faithful with home exercises. (Id.). She had no new complaints. (Id.). Plaintiff's diagnoses remained unchanged. (R. 357). Dr. Kirk noted that he feels that "she has reached [her]

maximum medical improvement [MMI]." (Id.). He gave Plaintiff a note indicating the same, recommended a follow-up in three months and encouraged her to continue home exercises. (Id.).

On March 19, 2012, Plaintiff presented for her follow-up appointment for low back pain. (R. 359). She reported little improvement but had been continuing to do exercises and working with a trainer at the gym she attends. (Id.). There were no new symptoms. (Id.). However, Plaintiff did report having some depressive symptoms, which she attributed to recent deaths in the family and to the ongoing stress of caring for her husband. (Id.). She did not feel the mental conditions were impairing her and she was not suicidal and did not want medication. (Id.). The physical examination noted Plaintiff was not in acute distress but her mood was mildly depressed. (R. 360). Her diagnoses included right SI joint sprain, LS strain/sprain and adjustment disorder with depressed mood. (Id.). The plan was to continue current management of pain and Dr. Kirk gave Plaintiff a note for her trainer to focus on core exercises. (Id.). Plaintiff was told to continue taking Robaxin and to return in sixth months or sooner, if needed. (R. 359, 361).

On March 29, 2012, Plaintiff presented to St. Joseph's Emergency Room reporting chronic back pain that became worse the day prior. (R. 342, 345). She also reported back "spasms." (Id.). Plaintiff stated the pain was moderate and similar to prior back pain. (Id.). She stated the pain was worsened by movement. (Id.). Plaintiff's medical history included chronic back pain. (Id.). Her physical examination showed Plaintiff in mild distress and normal findings except for lower back symptoms including low back "spasm" as well as cold feet but Plaintiff denied numbness. (R. 345). The record notes that Plaintiff denied a new injury. (Id.). The clinical impression was low back pain – acute. (R. 343). Plaintiff was given medication, her pain improved and she was discharged. (R. 343-44). Her prescriptions at discharge included Robaxin/methocarbamol, Naproxen and Lortab, a narcotic pain reliever. (R. 347).

On September 24, 2012, Plaintiff returned for her six month follow-up with Dr. Kirk for her chronic lumbar strain/sprain and right SI sprain. (R. 362). Plaintiff stated that she did not feel better, is learning to live with the discomfort and there is no change in the quality of pain. (Id.). The physical examination noted Plaintiff in no acute distress and with pleasant demeanor and showed mild/moderate lumbar paravertebral spasm, no midline tenderness, right SI tenderness and fair range of motion. (R. 363). Dr. Kirk added "lumbago" (i.e., low back pain) to Plaintiff's existing diagnoses of right SI joint sprain and LS strain/sprain. (Id.). The plan was to continue current regimen, continue Robaxin prescription and return in six months. (Id.).

## 2. Physical Therapy Notes

Plaintiff attended physical therapy at Buckhannon Physical Therapy from February 23, 2011 to May 5, 2011 and then again in November and December 2011. (R. 301-39). In general, Plaintiff's treatment included twenty-five to thirty minutes of exercise, ultrasound, moist heat and electrical stimulation. Plaintiff's treatment focused on her right lumbosacral area as well as her SI joint. The therapy notes indicate Plaintiff continued "progressing" in her treatment even with continued reports of pain.

On February 23, 2011, Plaintiff presented for a lumbar evaluation for her physical therapy. (R. 317-20). Plaintiff explained her motor vehicle accident and reported a tear in her ankle ligaments and a sprain/strain in her right LS. (R. 317). Plaintiff stated her pain/symptoms were in her right LS and SI joint and sometimes the entire LS region. (Id.). She rated her pain an eight out of ten at its worst and described the pain as a pulling sensation. (Id.). She stated that the pain was worse at night with prolonged lying/sitting and that nothing decreases the pain. (Id.). She reported numbness/tingling in the lower extremities bilaterally. (Id.). She reported limitations in her activities of daily living, including turning in bed, limited housework and

cooking as well as trouble with bathing, dressing, transferring from bed or chair and driving. (Id.). She was off work as a caregiver and seeking worker's compensation. (Id.).

The objective examination noted that while standing Plaintiff's posture showed right shoulder lower and slight increase in lordosis (i.e., abnormal curvature of spine). (R. 318). On palpitation, there was tenderness to the right LS region. (Id.). Plaintiff also wore a cam boot on her right ankle. (Id.). There was decreased lumbar range of motion. (Id.). While sitting, the physician notes slight increase of lordosis and right lower extremity decrease. (Id.). There was decreased range of motion for both internal and external rotation of hips. (Id.). The sitting straight leg raise and slump test was negative. (Id.). Strength in the left extremity was normal and decreased on the right for Plaintiff's hip and knee. (Id.). Plaintiff had normal sensation and pulses. (R. 319). When in supine position, Plaintiff had a positive FABER test (i.e., test dealing with the hip, lumbar and sacroiliac region), negative Scours, Thomas and supine SLR test. (Id.). Plaintiff had a negative SI joint dist/compression and positive piriformis test on the right. (Id.). Her hip range of motion when in the supine position was within normal limits. (Id.).

The location of Plaintiff's treatment was for her lumbar region, right SI joint and piriformis. (Id.). The assessment noted symptoms of right SI joint and LS strain/sprain with some right piriformis impairment. (R. 320). Due to her ankle impairment, Plaintiff ambulated with alerted gait pattern causing increase strain to the right SI joint region. (Id.). She had an absence of neurological symptoms. (Id.). Plaintiff's problem list included: 1) right LS pain: 8/10; 2) difficult with activities of daily living; 3) decrease lumbar range of motion; 4) positive right sitting SLR test; 5) decrease right lower extremity strength; 6) positive bilateral FABER test; 7) positive right piriformis test. (Id.). The plan was for Plaintiff to attend physical therapy two times a week for seven to eight weeks with the goal of exercise increasing flexibility, range of motion

10

and strength in her LS region and to decrease pain. (Id.).

On February 25, 2011, Plaintiff reported some decrease in lumbar pain. (R. 316). She tolerated the treatment well. (Id.). On March 1, 2011, Plaintiff again reported some decrease in pain and tolerated the treatment well. (R. 315). On March 4, 2011, Plaintiff continued to report pain. (R. 314). She tolerated the exercises but still had increased pain in LS/piriformis. (Id.).

On March 9, 2011, Plaintiff reported some increase in soreness in the lumbar region and stated that she was having the ankle boot removed. (R. 313). Plaintiff reported an increase in lumbosacral pain on the right but she tolerated treatment well. (Id.). On March 11, 2011, Plaintiff reported increased pain in her right lumbosacral region and pain in her right knee/ankle from discontinued use of the cam boot. (R. 312). The objective notes also state that Plaintiff continued to have an antalgic gait pattern. (Id.). The assessment noted continued symptoms of pain and stiffness in right lumbosacral region going into the left lower extremity. (Id.).

On March 16, 2011, Plaintiff reported continued pain around the right SI joint. (R. 311). The objective notes state that she was no longer wearing the cam boot but continued to have gait deficits. (Id.). The therapist noted palpable tenderness to the right posterior superior iliac spine ("psis"). (Id.). Plaintiff noted decrease in pain after treatment but the therapist noted: "[h]owever, gait deficits may be cont. to exacerbate symptoms." (Id.). The therapist stated at the next visit to assess pelvic levels and perhaps initial manual treatment if indicated. (Id.). On March 18, 2011, Plaintiff noted some decrease in pain but continued to have an antalgic gait pattern. (R. 310). The assessment noted a slight decrease in symptoms. (Id.).

On March 22, 2011, Plaintiff reported having some increase soreness in lumbar region, which she noted may be from ambulating differently due to her ankle sprain. (R. 309). She tolerated the treatment well. (Id.). On March 24, 2011, Plaintiff reported lumbar soreness but

tolerated the exercises well. (R. 308).

On March 30, 2011, Plaintiff reported that she may have "overdone" things the day before resulting in increased soreness. (R. 307). The assessment noted Plaintiff continued to report lumbosacral pain mainly on the right. (Id.). On April 1, 2011, Plaintiff reported pain at a seven out of ten at its worst and noted an increase of pain with increased activity. (R. 306). The objective notes show positive right FABER test, negative right piriformis test, negative sitting SLR test, right lower extremity strength deficit, eversion ankle 3/5 and all others 5/5. (Id.). The assessment noted an increase in pain and strength and range of motion to be slightly increased. (Id.). Her toleration of treatment was "fair" but her condition was progressing. (Id.).

On April 6, 2011, Plaintiff reported that Dr. Kirk gave her an order for a TENS unit and further noted that she was able to drive the day before. (R. 305). The assessment noted lumbosacral and heel pain. (Id.). On April 8, 2011, Plaintiff noted that she was having some increase soreness centralized to the lumbar region. (R. 304). Plaintiff was provided a TENS unit and instructed on precautions and use. (Id.).

On April 11, 2011, Plaintiff stated that she had increased pain after increased walking over the weekend. (R. 303). Her assessment noted continued lumbosacral soreness. (Id.). On April 13, 2011, Plaintiff continued to do well with the treatment program but had some increased soreness from being at the doctor's office the same day. (R. 302). The assessment noted some increased soreness due to increase of activity. (Id.). Her toleration of treatment was "fair." (Id.).

On April 20, 2011, Plaintiff reported she was sore in the lumbar area from helping to care of her young nephew. (R. 301). Plaintiff demonstrated improved ambulation. (Id.). She reported decreased symptoms of pain and tolerated the treatment well. (Id.). On April 22, 2011, Plaintiff stated she stepped in a hole which irritated her lumbar region and ankle. (R. 339). The

assessment noted she continued to have decreased symptoms of pain after treatment but stepping in the hole exacerbated her symptoms. (Id.). Plaintiff's toleration of treatment was "fair." (Id.).

On April 27, 2011, Plaintiff tolerated treatment well and continued to progress. (Id.). On April 29, 2011, Plaintiff reported some increase in pain with treatment due to ambulation the day before. (R. 337). This appointment integrated manual therapy for Plaintiff's LS strain. (Id.). The assessment noted continued soreness and Plaintiff's toleration of treatment was "fair." (Id.).

On May 3, 2011, Plaintiff reported pain at a five out of ten in lumbosacral region but reported no pain the night before when trying to sleep. (R. 336). The objective notes and assessment indicate an increased active range of motion and MMT. (Id.). The therapist also noted that Plaintiff may want to get a second opinion for her right ankle. (Id.). On May 5, 2011, Plaintiff reported some decrease in pain and was progressing well with treatment. (R. 335).

A note from July 11, 2011 states that physical therapy was discontinued as Plaintiff did not return. (R. 334).

On November 9, 2011, Plaintiff presented for a lumbar evaluation and reported right LS pain into her right ankle/lower extremity from a motor vehicle accident as well as left LS pain which started approximately one to two months prior. (R 330). Plaintiff rated the pain an eight out of ten, which she described as a pulling and stabbing sensation. (Id.). For activities of daily living, she reported difficult with showering, dressing and housework. (Id.). She reported she was not working. (Id.). She noted she previously saw a chiropractor without success. (Id.). Her goal was to decrease pain through physical therapy. (Id.).

The objective examination notes state that when standing Plaintiff's posture showed increased lordosis and decreased right shoulder; when sitting, her posture showed she leaned forward slightly. (R. 331). Her gait was antalgic. (Id.). When standing, Plaintiff had decreased

13

left and right lateral flexion. (Id.). When sitting, Plaintiff had decreased range of motion for her lumbar flexion, extension and right and left lateral flexion. (Id.). She also had decreased range of motion of her hips' internal and external rotation bilaterally. (Id.). Her sitting straight leg raise test and slump test were negative and her strength and sensation on the left and right extremities was normal. (Id.). When in the supine position, Plaintiff's FABER test was positive on the left and right and straight leg raise test was positive at forty degrees on the left and fifty-three degrees on the right as well as decrease hamstring flexibility on the right and left. (R. 332). Plaintiff's range of motion for her hips when in supine position was within functional limits on both the right and left for flexion but decreased for abduction. (Id.).

Plaintiff's treatment was designated for her lumbosacral area and her assessment noted continued symptoms of SI joint and LS impairments. (Id.). The physician also noted the presence of neurological symptoms. (R. 333). Plaintiff's problem list was summarized as: 1) LS pain, 8/10; 2) difficulty with activities of daily living; 3) decrease lumbar range of motion; 4) positive bilateral FABER test; and 5) positive bilateral supine straight leg raise test. (Id.). The treatment plan was physical therapy two times a week for six to eight weeks in order to increase mobility and strength and decrease pain. (Id.).

On November 16, 2011, Plaintiff noted she had some increase soreness after her first visit. (R. 329). Plaintiff's treatment focused on the lumbosacral region and included twenty-five to thirty minutes of exercise, moist heat and electrical stimulation. (Id.). The assessment noted less pain with exercises at the visit. (Id.). On November 18, 2011, Plaintiff reported increased pain in the left lumbosacral region. (R. 328). Plaintiff continued to do well with treatment and was progressing. (Id.).

On November 25, 2011, Plaintiff reported decrease in pain and continued to do well with

treatment. (R. 327). On November 30, 2011, Plaintiff said she was having spasms in her left lumbosacral region but tolerated the new exercises well. (R. 326). On December 1, 2011, Plaintiff reported some soreness in lumbar region from the new exercises. (R. 325). After treatment, Plaintiff reported overall decrease in pain and was progressing. (Id.).

On December 7, 2011, Plaintiff reported pain bilaterally in her lumbosacral region. (R. 324). The therapist adjusted some of Plaintiff's exercises accordingly. (Id.). The assessment noted that Plaintiff had increased symptoms of pain. (Id.). On December 8, 2011, Plaintiff reported pain across the lumbar region. (R. 323). Plaintiff noted decreased overall pain levels after treatment. (Id.).

On December 12, 2011, Plaintiff noted that she was "feeling a little better today." (R. 322). Plaintiff reported decrease in overall pain after treatment and was progressing. (Id.). On December 14, 2011, Plaintiff reported pain at a five out of ten and an eight out of ten at its worst. (R. 321). Plaintiff had decreased lumbar range of motion with extension and left and right lateral flexion. (Id.). Plaintiff's hip range of motion was also decreased. (Id.). MMT was 5/5 throughout. (Id.). The assessment noted limited range of motion as well as continued pain levels. (Id.). The plan was to continue treatment with a follow through with a physician. (Id.).

A note from April 9, 2012, indicates Plaintiff's physical therapy was discontinued for a home exercise program. (R. 321).

### 3. Medical Reports/Opinions

#### a. Physical RFC Assessment by Jill Lilly, August 29, 2011

Jill Lilly, a non-examining state agency single decision-maker, completed a Physical Residual Functional Capacity Assessment of Plaintiff on August 29, 2011. (R. 65-72). For exertional limitations, Plaintiff could occasionally lift/carry fifty pounds, frequently lift/carry

twenty-five pounds, stand/walk for six hours a day, sit for six hours a day and pull/push (including operation of hand and/or foot controls) for an unlimited amount of time during the work day. (R. 66). Ms. Lilly noted no postural, manipulative, visual, communicative or environmental limitations. (R. 67-69). As for her symptoms, Ms. Lilly noted that Plaintiff was seen in the emergency room on February 1, 2011 due to a motor vehicle accident. (R. 70). Ms. Lilly explained:

> All xrays were negative except soft tissue swelling was present for her right ankle. She still say she has to do most ADLs seated and has difficulty dressing or standing more than a few minutes due to pain. There does not seem to be evidence in her file of an impairment that could result in the significant limitations she describes. She does not seem fully credible.

(Id.). Ms. Lilly noted there were no medical source statements in the record regarding Plaintiff's physical capacities. (R. 71). As for additional comments, Ms. Lilly explains that Plaintiff was involved in a motor vehicle accident and reported pain in her low back, right hip and right ankle. (R. 72). She continued:

> Many xrays have been taken and there are no bony abnormalities. She had some soft tissue swelling in her right ankle initially, but most recently, an MRI of the same ankle was unremarkable. She has no spasms of her lumbar spine, no midline tenderness, her R si joint is tender and has increased pain with standing on R foot. Her ankle has some limitations of ROM in dorsiflexion, the ankle is not tender but tender points are in toe extensors.

(Id.). Ms. Lilly listed Plaintiff's diagnoses as right SI joint sprain and myofascial pain of the right ankle. (Id.). She noted that Plaintiff takes ibuprofen. (Id.). She noted Plaintiff's statements that she cannot lift over a gallon of milk, has to have help with some household chores, she can drive short distances and cannot stand for a more than a few minutes due to pain. (Id.).

On September 13, 2011, Dr. Subhash Gajendragadkar, M.D. reviewed the medical evidence of record and the initial RFC by Jill Lilly from August 28, 2011 and agreed/affirmed

the physical RFC as entered. (R. 288).

### b. Dr. Kirk, Treating Physician - Routine Physical Form, October 5, 2011

Dr. Kirk, Plaintiff's primary treating physician, completed a "Routine Abstract Form – Physical" provided by the West Virginia Social Security Disability Determination Section on October 5, 2011. (R. 281-83). Dr. Kirk noted that he first began treating Plaintiff on February 6, 2011 and had last seen her on August 31, 2011, with a total of six visits in the past year. (R. 281). Dr. Kirk listed Plaintiff's date of onset as February 1, 2011, the date of the car accident. (Id.). Plaintiff's diagnoses included right SI joint sprain, lumber spine strain/sprain, myofasical pain of the right ankle and s/p sprain. (Id.). Her medications included Robaxin, taken as needed. (Id.).

As for exertional limitations, Dr. Kirk opined that Plaintiff should avoid prolonged standing or sitting and may lift up to ten pounds occasionally and five pounds frequently. (Id.). As for musculoskeletal findings, Dr. Kirk marked normal grip strength, normal fine/gross manipulation and normal shoulders. (R. 282). He noted abnormal low back range of motion with "limited flexor [secondary to] pain," increased pain when standing on right foot, bilateral paravertebral spasm and right SI joint tenderness. (Id.). Plaintiff's straight leg raise (sitting/supine) was negative. (Id.). Dr. Kirk described Plaintiff's gait as antalgic and noted that Plaintiff did not use an assistive device for ambulation. (Id.). Plaintiff's motor strength, sensory and reflexes were all normal. (Id.). Dr. Kirk noted no neurological, cardiopulmonary, special senses or other symptom abnormalities. (Id.).

### c. Physical RFC Assessment by Dr. Subhash Gajendrafadkar, M.D., October 5, 2011

Dr. Gajendrafadkar, a non-examining state agency medical consultant, completed a physical RFC assessment of Plaintiff on October 5, 2011. (R. 293-300). Plaintiff's primary

diagnoses were listed as motor vehicle accident: right SI joint/hip and LS sprain with a secondary diagnosis of right ankle sprain/myofascial pain. (R. 293).

For exertional limitations, Plaintiff could occasionally lift/carry fifty pounds, frequently lift/carry twenty-five pounds, stand/walk for six hours a day, sit for six hours a day and pull/push (including operation of hand and/or foot controls) for an unlimited amount of time during the work day. (R. 294). Dr. Gajendrafadkar found no postural, manipulative, visual, communicative or environmental limitations. (R. 295-97). As for symptoms alleged, Dr. Gajendrafadkar noted Plaintiff's adult function report and personal pain questionnaire were partially credible as the degree of Plaintiff's symptoms or pain was inconsistent with the exam findings in the medical evidence of record. (R. 298).

Dr. Gajendrafadkar marked that there was a medical source statement regarding Plaintiff's physical capacities in the record, which made findings significantly different than his findings. (R. 299). Dr. Gajendrafadkar noted that Dr. Michael Kirk's October 5, 2011 physical abstract form stated that Plaintiff should avoid prolonged standing and sitting, may lift no more than ten pounds occasionally and five pounds frequently. (Id.). Dr. Gajendrafadkar stated he disagreed with Dr. Kirk's opinion because the degree of limitation opined by Dr. Kirk is disproportionate to exams and x-ray findings in the record. (Id.).

In concluding, Dr. Gajendrafadkar stated that Plaintiff is a fifty-eight year old female with a ninth grade education and experience as a caregiver. (R. 300). Her allegations include pain in the LS and right ankle. (Id.). He said to refer to the initial physical RFC for additional activities of daily living and medical evidence of record. (Id.). He then summarized the findings of Dr. Kirk's October 11, 2011 physical abstract form and noted that the degree of limitations Dr. Kirk listed is disproportionate to exams and x-rays findings in the record. (Id.).

18

## C. Testimonial Evidence

At the ALJ hearing held on November 27, 2012, Plaintiff's counsel argued that given Plaintiff's advanced age (i.e., fifty-nine years old on the date of the hearing), her inability to do prior work and an appropriate exertional level of sedentary, or even light, that the Medical Vocational Guidelines (i.e., grids) would warrant a finding of disabled. (R. 32). Counsel asserted that the previous finding that Plaintiff could perform medium work was arbitrary and capricious. (R. 33). Counsel explained that Plaintiff's treating physician found she could not perform medium work, his examinations show additional muscle spasms and problems in her back. (Id.). Moreover, counsel stated that the physical therapy undertook by Plaintiff "was not some type of strenuous physical therapy" but mainly "receiving deep heat and TENS type stimulation [of] the muscles." (Id.). In sum, counsel concluded "she's not capable of being on her feet enough, bending and pushing and pulling enough at the exertional levels required." (Id.).

Plaintiff testified that she was fifty-nine years old and married. (R. 34). Her husband had a stroke in 1987 and is disabled. (Id.). Plaintiff testified that she went as far as eleventh grade in school and then obtained her GED. (R. 35). She received no additional special education or vocational training. (R. 36). She receives no income or benefits and does not have a medical card. (Id.).

Plaintiff testified regarding her work experience. Plaintiff worked as a caregiver at various hospitals and provided in-home care. (R. 37-38). This work required her to do cooking and cleaning and lifting patients, often as heavy as 200 pounds, from a chair or bed to their feet. (R. 37). Plaintiff also worked as a kitchen aid for Davis Memorial Hospital, which required lifting sixty pounds and standing all day. (R. 39). Prior to that she worked for Fremont Correctional Services as a kitchen manager that supervised prisoners in cooking meals but also

involved physical tasks, such as serving on the line, lifting cases of canned food, lifting twenty-five to fifty pound bags of dry goods, and loading and pushing carts. (R. 39, 56). Plaintiff also worked full-time at Dean's Variety Mart for six months doing cashier work and stocking, which required lifting or carrying items weighing up to fifty pounds, such as cases of beer and canned food. (R. 41-42).

Plaintiff further testified that her impairments included severe back pain that runs down the leg into the bottom of the foot, behind the toes, as well as spasms in her back. (R. 43). Plaintiff's injuries stemmed from a motor vehicle accident, which Plaintiff stated was involved in pending litigation. (R. 43-44). Plaintiff also testified regarding her right ankle pain. (R. 53). Plaintiff stated that her ankle has not gotten better and she cannot walk on uneven ground or her ankle hurts and swells. (Id.). Since her accident, Plaintiff testified she had gained weight due to inability to exercise. (R. 51).

At the hearing, Plaintiff testified regarding her physical therapy. Plaintiff stated that she would warm up on the bike for about three minutes and then would lay on a table for her TENS treatment. (R. 52). The physical therapist would then pull and stretch her leg. (Id.). Plaintiff said the therapy temporarily improved the pain but she would still experience pain when trying to get in her car afterwards. (Id.). Plaintiff said she also went a fitness center to exercise and received assistance from a "trainer" (i.e., a "girl" at the gym) who gave her pointers on what to do or not do. (R. 53). She testified that she "tried the treadmill for a little while" but that is when the muscle spasms in her back got worse. (Id.). She stated that she no longer goes to the gym. (Id.).

In regard to her medical treatment, at the end of the hearing, the ALJ asked whether Dr. Kirk was an orthopedic doctor, to which Plaintiff's counsel explained that Dr. Kirk was her primary care doctor. (R. 63). Plaintiff stated that she was referred to Dr. Kim for her ankle, but

confirmed that she had not been referred to an orthopedic doctor for her back. (Id.).

Plaintiff also testified regarding her daily activities. Plaintiff said she is not able to drive because it hurts her back but she does drive to church on occasion, which is just a few miles from her home. (R. 35). When asked how she spends her days, Plaintiff stated that she is bored and tries "to stay out pain and do the best you can." (R. 44-45). She gets out of bed and does very little due to constant pain. (R. 45). Plaintiff testified that her husband is able to cook for himself, that they do not eat large meals and that her daughter will make meals, which her and her husband can then reheat. (R. 47). Plaintiff also testified that her daughter has done the cleaning since her car accident in February. (Id.). Her daughter also does the grocery shopping. (R. 48). Plaintiff testified that she is unable to do any yard work. (Id.).

As for caring for others, Plaintiff testified that her husband does not have a caregiver and that he does the best he can caring for himself since his stroke. (Id.). Plaintiff stated that she does not take care of him and that they "take care of one another." (Id.). She stated that her husband's biggest problem is not remembering so she tries to get him to do things to keep him from hurting himself. (Id.). The ALJ noted that Plaintiff reported previously in the record that she experienced stress from caring for her husband. (R. 46). Plaintiff explained that her husband "has a bad habit of not being able to remember that he does stuff that might hurt himself, like he might go outdoors, or he'd just go sometime and step completely off the porch." (Id.). She said his mind "doesn't work proper" at times. (Id.). The ALJ then clarified that the care is more focused on keeping her husband in line and out of trouble rather than providing physical care. (R. 46-47).

The ALJ also questioned Plaintiff regarding her ability to care for others based on a complaint included in her physical therapy notes of soreness in her lumbar spine because she was "taking care of your young nephews." (R. 47). Plaintiff explained that she was not "taking care"

of them, "they were just visiting." (Id.). She said that they had been in the yard and she had stepped into uneven ground, which triggered the back soreness. (Id.). The ALJ then clarified that the soreness was from stepping in the hole, not from lifting her nephew. (R. 48). Plaintiff stated she has four nephews, one of which is eight, and their grandfather lives above their home so the children come to visit but she does not babysit them. (R. 49).

Plaintiff's attorney asked her what she thinks prevents her from working with respect to her impairments. Plaintiff testified that there was "no way" should could climb, bend down or lift at the levels she did in her prior jobs. (R. 51). She also cannot tolerate prolonged standing. (Id.).

**D.    Vocational Evidence**

Also testifying at the hearing was Timothy E. Mahler a vocational expert ("VE"). Mr. Mahlerm characterized Plaintiff's work over the past fifteen years. (R. 58). Mr. Mahler classified Plaintiff's work as a caregiver in homecare as medium, semi-skilled, but noted that the position involved some work at the very heavy level. (Id.). Plaintiff's work as a kitchen manager at the correctional facility was classified as a kitchen helper, medium, unskilled. (Id.). Plaintiff's work as a cashier and stock person was classified as cashier, light, semi-skilled, and stock clerk, medium, unskilled. (Id.).

With regard to Plaintiff's ability to return to her prior work, Mr. Mahler gave the following responses to the ALJ's hypothetical:

> Q:     [A]ssume an individual at the same age, education, and past work experience as claimant with the following abilities. Said individual is capable of medium exertional level work. Can an individual with these limitations perform the claimant's past work?
>
> A:     Yes, your honor, as with the caregiver, as described in the DOT and one in the nation [sic] economy. However, as she performed it, no. The other jobs would be feasible, your honor.

(R. 57-58). Incorporating the above hypothetical, the ALJ then questioned Mr. Mahler regarding

Plaintiff's ability to perform her past work at the light exertional level:

Q: Okay, If you add to this limitation that the individual is capable of light exertional level work, can never climb ladders, ropes, or scaffolds, can occasionally perform all other postural activities. Can an individual with these limitations perform any of the claimant's past work?

A: Only the cashier, your honor, but as part of that job, she was required to lift up to 50 pounds stocking, so I would say.

Q: Now is it cashier as is generally performed?

A: Cashier as described in the DOT and generally performed. But again, most cashiers, when it was sat [sic] down time, was required to stock. Some more than others, but they are usually part of the job description of cashier is to stock shelves and clean the store.

Q: And I guess I want to understand your answer better.

A: Okay.

Q: Okay. When you listed the occupations, you listed two separate occupations.

A: Yes.

Q: A cashier, and a stock clerk?

A: Mm-hmm.

Q: Okay. Is my understanding, if I understand correctly, that with the limitation I gave, this individual could perform the cashier job as is generally performed but not as she performed?

A: Yes, your honor. Yes, your honor. The job of themes....

Q: Okay, and could not perform the stock?

A: Yes, the stock...

Q: Job of a stocker?

A: ...the duties of her job at Dean's Mart, she would not able to perform that

23

aspect of her job.

(R. 59-60). The ALJ then questioned Mr. Mahler regarding Plaintiff's ability to perform other

work in the regional and national economy when incorporating the previous light hypothetical:

> Q: Okay. If the individual, first of all, would there be other jobs this individual could perform with the limitations that were given?

> A: Yes, your honor. At light, with no climbing and occasional posturing, there would be labelers and markers…laundry folders…mail room clerks…photo copy machine operators.

> Q: And did the claimant acquire any skills from her past relevant work that would fit into that residual functional capacity?

> A: No, your honor. The skills she acquired as a caregiver and a kitchen aid and cashier would not transfer to other jobs.

> Q: Okay.

> A: They're basically unskilled and low semi-skilled.

(R. 60-61). The ALJ then questioned the VE regarding the availability of jobs in the national or

regional economy when considering additional limitations to the hypothetical:

> Q: And would those jobs still be available if there was a limitation of one to two minute changes of position every 30 minutes, without being off task?

> A: Yes, your honor. These jobs, the essential duties can be performed sitting or standing with these jobs.

> Q: And likewise, for the cashier job? Would it still?

> A: No.

> Q: It could not.

> A: Cashier has to be on their feet all the time.

> Q: Okay. Now if the individual were off task, and would miss work 20 percent of the work week or greater, would there be jobs available for this individual?

24

A:      No, there would not be, your honor.

Q:      Okay. How much time off task do employers tolerate?

A:      Usually 10 percent. Maximum that is tolerable in competitive employment, your honor.

(R. 61-62). The VE stated that his testimony was consistent with the Dictionary of Occupational Titles with the exception of the sit/stand option, which is not in the DOT definitions but based on the VE's experience for the past thirty-two years in placing disabled workers. (R. 62).

Plaintiff's attorney then questioned Mr. Mahler regarding the cashier/stocker job:

Q:      I believe it goes back to the cashier/stocker job, and the judge did ask you to clarify, but's my understanding, or I'm asking you, that was a composite job, wouldn't you say?

A:      Yes, it was.

Q:      And, she was required to do both?

A:      Yes, and frequent [sic], a supermarket or small store, you have to do two or three different jobs.

Q:      I understand. I have no more questions, your honor.

(R. 62). Plaintiff's counsel then stated:

We don't believe that the cashier's job is a job in and of itself, and this lady's 59 years of age, going on 60, ad all these jobs were performed at the medium. She's not capable of any of her prior work. She has no transferable skills. She's in a grid allowance certainly at age 59, and again at 59 and a half, so we'd ask you to give every consideration to an allowance on this lady, because her testimony is consistent, and her treating physician's opinion is consistent, and we don't think that…she grids at any light or sedentary level that you place her.

(R. 63).

**E.    Disability Reports**

On June 13, 2011, J. Godwin completed a Disability Report following a face-to-face interview with Plaintiff. (R. 155-57). Godwin observed difficulty standing and walking and

25

described Plaintiff's movements as stiff. (R. 156).

In another Disability Report, Plaintiff listed her physical conditions as pain in right side muscle in lumbar area and pain in the right ankle. (R. 159). Plaintiff stated that she stopped working on February 1, 2011 because she was in a car accident "which caused me to be in constant pain and unable to hold a job." (Id.). Plaintiff noted that she completed ninth grade and received no additional job training or education. (Id.). Plaintiff listed Dr. Kirk and Dr. Kim as her treating physicians and noted that she was prescribed pain medication "but I am afraid to get addicted to it therefore I only take ibuprofen 600 mg." (R. 163-64).

On July 19, 2011, Plaintiff completed a Personal Pain Questionnaire. (R. 175-79). First, Plaintiff described her right ankle, foot and shin pain as continuously aching, stabbing, burning and throbbing. (R. 175). She said the pain is always there to some degree and stops her from bending, lifting or completing chores when it is bad. (Id.). The pain is made worse by exercise, sitting, standing lifting, etc. (Id.). The pain is relieved with rest, TENS unit, moring position, pain medication (i.e., Ibuprofen 600 mg) and cortisone shots in her ankle joint. (Id.). Second, Plaintiff described her lower back, right lumbar muscle as a continuous aching, stabling and throbbing pain that is always there but worse at times. (R. 176). Plaintiff stated that there is often too much pain to complete common household chores, working, lifting, gardening, sitting or walking. (Id.). The pain is made worse by exercise, lifting standing or sitting for long periods of time. (Id.). The pain is relieved by TENS unit and medication. (Id.). Plaintiff commented that the pain in her ankle and back limit her ability to complete chores and work; she experiences pain when lifting, bending, sitting, standing and laying; the pain varies from day to day but is always there to some degree; and the more she does the worse the pain is. (Id.).

A report of contact form dated August 29, 2011 noted that Plaintiff was limited to a

medium exertional level with no restrictions. (R. 192). Plaintiff was listed as an individual of advanced age (i.e., fifty-five to fifty-nine years old) with a limited education level (i.e., grade seven to eleven). (Id.). Plaintiff was listed as being able to return to her past work as either a dietary aid or kitchen manager. (Id.).

## F.    Lifestyle Evidence

On an adult function report dated July 19, 2011, Plaintiff stated that the injury to her back and ankle limits her ability to stand, walk, lift, bend over, sit or lay. (R. 181). When describing her daily activities, Plaintiff stated that she takes a shower with assistance, eats breakfast, dresses, does physical therapy exercises, uses TENS unit on her back, rests, does light housework while resting her ankle and back in between, eats lunch/supper and prepares for bed. (R. 185). She does not take care of anyone else or pets. (Id.). She receives help with housework and caring for her dog from her daughter, son-in-law and granddaughter. (Id.). Before the onset of her conditions, Plaintiff was able to work, do all housework, garden, walk for exercise and babysit. (Id.). Plaintiff also reported that her pain is constant and impacts her sleep. (Id.).

As for personal care, Plaintiff stated that when dressing she experiences pain lifting her arms to put on a shirt and must limit the type of shoes she can wear. (Id.). She needs assistance putting the shower chair into and out of the bathtub. (Id.). She had difficulty lifting her arms to fix her hair, needs assistance shaving her legs and needs help using the toilet when her back is extremely hurting. (Id.). As for meals, Plaintiff stated that she cannot stand at the stove to stir; she prepares meals daily with breaks in between but is limited to light cooking for about two to three minutes at a time. (R. 186). Because of her conditions, Plaintiff said that she can no longer prepare large meals and cannot bend to put heavy items in the oven. (Id.). In regard to house chores and yard work, Plaintiff stated that she is able to put laundry into the washer, fold laundry

27

while sitting, do light dusting and wash her own dish after eating. (Id.). When doing these activities, she does one thing at a time and rests in between chores when having more pain. (Id.). Plaintiff said she goes outside every day; she is able to drive a car a short distance and is able to ride in a car. (R. 187). She explained that her daughter shops for groceries. (Id.). Plaintiff goes shopping one to two times per month to pick up essentials as needed in between her daughter's shopping trips and spends no more than ten minutes in the grocery store because the pain in her ankle and back make it difficult to walk. (Id.).

Plaintiff stated that her hobbies and interests include light gardening, reading and walking, which she is no longer able to do. (R. 188). Plaintiff explained that she can longer work the garden hoe or pick any items that require bending or lifting. (Id.). For social activities, she talks on the phone daily but rarely travels to places on a regular basis depending on her pain. (Id.). For example, she had not been to church in two months. (Id.). Plaintiff said she usually travels once a month and limits her travel to doctor appointments and stops at the grocery store when she is already out; she does not need someone to accompany her. (Id.). Since the onset of her conditions, Plaintiff stated that she no longer attends church weekly or her granddaughter's soccer games and she has not been able to travel to see friends or relatives. (R. 189).

In regard to her abilities, Plaintiff reported that her conditions affect: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks and using hands above her hand. (R. 189). Plaintiff explained that the pain in her back limits lifting any more than a jug of milk, limits bending and reaching above her head. (Id.). She said that the pain in her back also limits sitting, laying or standing; the time she is able to do these things depends on her pain level. (Id.). Plaintiff further stated that her ankle and back pain limits walking and stair climbing and that rough terrain is difficult. (Id.). Plaintiff estimated that

depending on her pain she could walk 1/10 of a mile and would need to rest for approximately two minutes before resume walking. (Id.).

Plaintiff stated that she uses a TENS unit, which was prescribed in March 2011. (R. 190). She also takes Ibuprofen 600mg two times a day for pain and does not take any other pain medicine because she is afraid of the side effects. (R. 191). She further noted that the weakness and pain in her back and ankle vary daily but is always there. (Id.). She explained that the pain gets worse when she does more activities, such as walking, shopping, light housework or driving. (Id.). She usually cannot do much following trips to the doctor or the grocery store. (Id.).

## IV. THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V. ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. **The claimant last meets the insured status requirements of the Social Security Act through March 31, 2013.**

2. **The claimant has not engaged in substantial gainful activity since February 1, 2011, the alleged onset date (20 CFR 404.1571 *et seq*.).**

3. **The claimant had the following severe impairments: lumbar strain; right SI joint strain; history of ankle strain (20 CFR 404.1520(c)).**

4. **The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).**

5. **After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) performing all postural movements occasionally, except never climbing ladders, ropes or scaffolds.**

**6.** The claimant is capable of performing past relevant work as a cashier. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

**7.** The claimant was not under a disability, as defined in the Social Security Act, from February 1, 2011, through the date of this decision (20 CFR 404.1520(g)).

(R. 18-23).

# VI. DISCUSSION

### A.  Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual

finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

**B.    Contention of the Parties**

In her motion, Plaintiff asserts that "Defendant's decision denying Plaintiff's claim is not supported by substantial evidence." (Pl.'s Mot. at 1). Specifically, Plaintiff alleges that:

- The ALJ's failure to provide an Exhibit List with the unfavorable decision, as required by the SSA's HALLEX manual, deprived Plaintiff of due process.

- The ALJ erred by finding Plaintiff had prior work as a cashier when the VE had classified Plaintiff's past work as a "composite job" of "cashier/stockperson" and separating out the lighter aspect of a "composite job" constitutes legal error.

- The ALJ improperly discredited Plaintiff's treating physician's opinion.

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 4-10, ECF No. 12). Plaintiff asks the Court to "remand the case for the sole purpose of calculating benefits as Ms. Yoakum is disabled, even if limited to sedentary or light work, under the Medical-Vocational Guidelines." (Id. at 15).

Defendant, in her motion for summary judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1). Specifically, Defendant alleges that:

- Plaintiff's due process rights were not violated because she was on notice about which exhibits the ALJ took into consideration.

- Substantial evidence supports the ALJ's finding that Plaintiff could perform her past relevant work as a cashier as it is generally performed in the national economy.

- The ALJ complied with the regulations in weighing Dr. Kirk's treating source opinion.

(Def.'s Br. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 7-12, ECF No. 14).

**C.    Analysis of the Administrative Law Judge's Decision**

1. **Whether Plaintiff's Due Process Rights Were Violated for the ALJ's Failure to Include the Exhibit List with her Decision as Required by HALLEX**

Plaintiff argues the ALJ violated SSA's own rules (i.e., HALLEX) and Plaintiff's due process rights by failing to include an Exhibit List with Plaintiff's unfavorable decision. (Pl.'s Br. at 5). Plaintiff explains that SSA's inter-agency rules recognize a constitutional due process right to have an Exhibit List accompany an unfavorable decision and the ALJ's failure to include the List resulted in reversible error. (Id.). Defendant argues that HALLEX lacks the force of law and does not impose judicially enforceable duties on the ALJ or the courts. (Def.'s Br. at 8). Moreover, Defendant asserts that the ALJ notified Plaintiff and her counsel during the administrative hearing about which exhibits were being admitted into the record and Plaintiff suffered no prejudice. (Id.).

The Hearings, Appeals, and Litigation Law Manual ("HALLEX") is a "manual in which the Associate Commissioner of Hearings and Appeals conveys guiding principles, procedural guidance and information to the office of Hearings and Appeals (OHA) staff." Melvin v. Astrue, 602 F. Supp. 2d 694, 699 (E.D.N.C. 2009). HALLEX I-2-1-20 states that "if the ALJ issues a partially favorable or unfavorable decision, the exhibit list must be prepared in final form and placed in the claim file." The rule further explains in a note:

> The Chief Administrative Law Judge (CALJ) in a Reminder dated October 25, 1999, stated that based on the constitutional due process requirement that a claimant has the right to know upon what basis the ALJ is making the decision in his/her case, the preparation of exhibit lists in partially favorable and unfavorable cases is not a discretionary practice. Exhibit lists must be prepared.

HALLEX I-2-1-20.

The Fourth Circuit has not addressed whether a violation of HALLEX rules constitutes reversible error. However, the Fifth and Ninth Circuits have addressed the issue and they

disagree in their conclusions. Compare Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (holding that HALLEX is not binding on the Commissioner and allegations of noncompliance with the manual are not reviewable) with Newton v. Apfel, 209 F.3d 448, 459 (5th Cir. 2000) (holding that a violation of HALLEX is only reversible error if the plaintiff can demonstrate prejudice resulting from the violation). Despite their disagreement on the reviewability of a violation of HALLEX rules, both the Fifth and the Ninth Circuits have determined that HALLEX is an internal agency procedure manual that does not carry the force of law. See Moore, 216 F.3d at 868-869 ("HALLEX is a purely internal manual and as such has no legal force"); see also Newton, 209 F.3d at 459 ("HALLEX does not carry the authority of law"). While the Fourth Circuit has not provided any guidance regarding the issue of whether HALLEX is judicially enforceable, other district courts from within the Fourth Circuit have adopted the Ninth Circuit's approach. See Stephens v. Comm'r of Soc. Sec., No. 3:13-CV-03, 2013 WL 6044385, at *49 (N.D.W. Va. Nov. 14, 2013) (finding that "a failure to comply with HALLEX, if one did occur, does not mandate remand"); see also Schrader v. Astrue, No. 3:12-CV-54, 2013 WL 1192315 (N.D.W. Va. Mar. 22, 2013) (explaining that HALLEX is "an internal Social Security Administration policy manual ... [that] does not impose judicially enforceable duties on either the ALJ or [the] court."); Harris v. Astrue, No. 2:12-CV-45, 2012 WL 7785082, at *6 (N.D.W. Va. Nov. 30, 2012) (finding that "[b]ecause HALLEX is an agency interpretation that lacks the force of law, this Court cannot force the Commissioner to follow it or provide a remedy to an claimant who avers that the Commissioner did not follow it."); Allen v. Astrue, No. 5:09-CV-81, 2010 WL 2196530, at *5 (N.D.W. Va. May 28, 2010) (stating that "HALLEX, as an internal guidance tool, 'lacks the force of law'") (internal citations omitted)); Melvin v. Astrue,

602 F.Supp.2d 694, 704-05 (E.D.N.C. 2009) (citing <u>Moore</u>, "the court rejects claimant's reliance on the ALJ's alleged failure to comply with HALLEX 1-5-4-66.").

Here, the ALJ failed to include the Exhibit List with Plaintiff's unfavorable decision as required by HALLEX I-2-1-20. However, as the above cited case law demonstrates, HALLEX does not carry the "force of law" and failure to comply with HALLEX does not require remand. Accordingly, the Court rejects Plaintiff's argument that the case requires remand based on the ALJ's failure to comply with HALLEX I-1-2-20.

Moreover, "[a] due process claim will not succeed, however, if the claimant fails to show prejudice." <u>Mays v. Colvin</u>, 739 F.3d 569, 573 (10th Cir. 2014) (citing <u>Energy W. Mining Co. v. Oliver</u>, 555 F.3d 1211, 1219 (10th Cir. 2009)). Here, Plaintiff has failed to show prejudice by the exclusion of the Exhibit List. At the administrative hearing, the ALJ admitted the exhibits in the file as "B1A through B3A, B1B through B10B, B1D through B2D, B1E through B12E, and B1F through B9F." (R. 31). Plaintiff's counsel did not object to the admission of the evidence and counsel affirmed that he had an opportunity to review the record. (R. 30-31). The ALJ's decision cites to these exhibits in a manner which allows Plaintiff determine what evidence the ALJ relied on in making her findings. <u>See</u> <u>Teeters v. Astrue</u>, No. CIV S-09-2997 DAD, 2011 WL 1135184, at *5 (E.D. Cal. Mar. 28, 2011). Accordingly, Plaintiff suffered no prejudice from the ALJ's failure to include the Exhibit List with her unfavorable decision; thus, the ALJ did not commit reversible error on this issue.

### 2. Whether the ALJ Erred When Considering Plaintiff's Past Relevant Work

At the fourth step of the sequential evaluation process, the ALJ assesses the claimant's residual functional capacity and considers whether the claimant can perform her past relevant work. <u>See</u> 20 C.F.R. §§ 404.1520(a)(4)(iv), 1520(e), 1520(f). If the ALJ finds that the claimant is

able to do her past relevant work, the claimant is not disabled. Id. If the claimant's impairments prevent her from performing her past relevant work, then the ALJ proceeds to the fifth step.

Plaintiff argues that the ALJ improperly divided Plaintiff's past work as a cashier *and* a stockperson into two separate jobs: a cashier position, which Plaintiff could perform at the light exertional level, and a stock clerk position, which Plaintiff could not perform at the light exertional level. (Pl.'s Br. at 6). Plaintiff explains that her previous work should be classified as a composite job (i.e., "a job that requires significant portions of job duties from two separate jobs")." (Id.). Further, the VE testified that Plaintiff's prior job as a "cashier and stockperson" was a composite job. (Id.). Thus, the ALJ erred by finding Plaintiff could return to her prior work as a "cashier" by separating out the lighter aspects of Plaintiff's composite job. (Id. at 6-7). By doing so, Plaintiff states that "the ALJ deprived Ms. Yoakum of the benefits of the Med-Voc Guidelines[2] as the ALJ forced Ms. Yoakum to perform work that was not included in Ms. Yoakum's prior relevant work history." (Id. at 7).

Defendant argues that Plaintiff worked as a cashier with "stocking duties." (Def.'s Br. at 11). Thus, the ALJ found that Plaintiff could perform her past relevant work as a cashier, as it is generally performed in the national economy (i.e., light level), not as actually performed by Plaintiff (i.e., medium level). (Def.'s Br. at 9-11). Defendant argues that Plaintiff's work was not a "composite job," that the VE testified Plaintiff could perform work as a cashier as generally performed in the national economy and pursuant to SSR 82-61, "Plaintiff was not required to have had a job solely as cashier to be found able to perform that aspect of a composite job as was generally performed in the national economy." (Id. at 11-12).

---

[2] Medical-Vocational Guideline 202.06 provides that a person who is age fifty-five, with no prior work at the light level, is limited to work at the light level, and has no transferable skill to the light level is presumed to be disabled. 20 C.F.R. Part 202, App. 2.

Pursuant to SSR 82-61, a composite job is defined as a job that has "significant elements of two or more occupations and, as such, have no counterpart in the DOT." SSR 82-61, 1982 WL 31387 (S.S.A. 1982). The testimony of both Plaintiff and the VE at the administrative hearing demonstrates that Plaintiff's job at Dean's Variety Mart involved two distinct positions. When asked to describe her position at Dean's Variety Mart, Plaintiff said: "Cashier. Stocking." (R. 42). Plaintiff testified that the most she had to lift was fifty pounds, such as cases of beer and canned food. (Id.). In regard to Plaintiff's prior work, the VE testified that Plaintiff performed two jobs: cashier classified as light, semi-skilled and stock clerk classified as medium, unskilled. (R. 58). When classifying Plaintiff's work, the ALJ even clarified that that the VE listed two separate jobs. (R. 59) (stating that "[w]hen you listed the occupations, you listed two separate occupations…a cashier and a stock clerk."). Furthermore, when Plaintiff's counsel asked the VE whether the cashier/stocker job was a composite job, the VE answered "Yes, it was...[at] a supermarket or small store, you have to do two or three different jobs." (R. 62).

The relevant case law states that "[w]here it is clear that a claimant's past employment was a 'composite job,' an administrative law judge may not find a claimant capable of performing [her] past relevant work on the basis that [she] can meet *some* of the demands of [her] previous position, but not *all* of them." Austin v. Astrue, Comm'r of Social Security, No. 2:09CV1096–SRW, 2010 WL 2868217, at *10 (M.D. Ala. July 19, 2010) (emphasis added) (quoting Bechtold v. Massanari, 152 F.Supp.2d 1340, 1345 (M.D. Fla. 2001), aff'd, 31 Fed. Appx. 202 (11th Cir. 2001); see also Peterson v. Astrue, No. 1:09-CV-00209, 2010 WL 3219293, at *7 (N.D. Ind. Aug. 12, 2010) (finding that "the ALJ ran afoul of the proper method for analyzing a composite job at step four" by failing to address the "medium work" component of the claimant's past work as a cashier/clerk at a hardware store); Roberts v. Astrue, No. 8:08–

CV–120–T–17EAJ, 2009 WL 722550, at *3 (M.D. Fla. Mar.18, 2009) ("[W]here an individual cannot perform any of his previous jobs, but only *one or more tasks* associated with his past relevant work, step four of the sequential evaluation must be resolved in favor of the claimant.") (emphasis added). Thus, when a claimant's past relevant work involves a composite job, the ALJ must determine whether the claimant can perform the duties and demands of each position that comprises the composite job.

Moreover, an ALJ "may not deem a claimant capable of performing past relevant work by dividing the demands of a composite job into two separate jobs and finding…her capable of performing the less demanding of the two jobs." Gallant v. Astrue, No. 09–357–P–S, 2010 WL 2927263, at *5-6 (D. Me. June 20, 2010); see also Valencia v. Heckler, 751 F.2d 1082, 1086 (9th Cir. 1985) ("Every occupation consists of a myriad of tasks, each involving different degrees of physical exertion. To classify an applicant's "past relevant work" according to the least demanding function of the claimant's past occupations is contrary to the letter and spirit of the Social Security Act."). Rather, "[t]he gravamen of the caselaw…is that an administrative law judge must analyze whether a claimant can perform *each* job within a composite job, whether as actually performed or as generally performed in the national [ ] economy." Gallant, 2010 WL 2927263, at *6 n. 6; see also Peterson, 2010 WL 3219293, at *5-7.

The testimony of Plaintiff and the VE establishes that Plaintiff's position at Dean's Variety Mart was a composite job of cashier/stock clerk with a mixture of duties at the light and medium exertional levels. Rather than addressing whether or not Plaintiff held a composite job, the ALJ focused instead on the limited portion of the VE's testimony stating that Plaintiff could perform her past work as a cashier at the light level. (R. 23). Based on the record demonstrating Plaintiff performed a composite job, substantial evidence does not support the ALJ's finding that

Plaintiff can perform her past relevant work as a cashier, as generally performed, at the light exertional level. The ALJ ran afoul of the aforementioned case law by dividing the demands of Plaintiff's composite job into two separate jobs and finding that Plaintiff could perform work as a cashier, the least demanding of the two jobs. Accordingly, the ALJ erred in evaluating Plaintiff's past relevant work and substantial evidence does not support the ALJ's decision at step four of the sequential evaluation process.

Furthermore, the ALJ failed to make a finding in her decision that the position was not a composite job. (R. 23). As such, Defendant's argument that Plaintiff's job was not a composite job is merely a post hoc rationalization. See Radford v. Colvin, 734 F.3d 288, 294 (4th Cir. 2013) (citing Christopher v. SmithKline Beecham Corp., 132 S. Ct. 2156, 2166, 183 L. Ed. 2d 153 (2012)); see also Robertson-Furry v. Astrue, No. 3:10-CV-110, 2011 WL 4628685, at *4 (N.D.W. Va. Oct. 3, 2011) (stating that "this Court will not affirm an ALJ based upon its own post hoc rationalizations."). The ALJ has a basic obligation to fully and fairly develop the record, including clarifying any ambiguity with regard to a claimant's past relevant work. The Social Security rules state:

> The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.

SSR 82-62, 1982 WL 31386, at *3 (S.S.A. 1982). Here, the ALJ failed to explain her reasoning at step four with regard to Plaintiff's composite job. See Gregory v. Astrue, No. 5:07–cv–19–Oc–GRJ, 2008 WL 4372840, at *6 (M.D. Fla. Sept. 24, 2008) (remanding the case for the ALJ's failure to fully develop the record on the issue of whether Plaintiff's job was a composite job). Based on the testimony of both Plaintiff and the VE that her position was a composite job, the

ALJ should have provided at minimum a finding regarding the position or included some analysis. Instead, the ALJ's step four analysis stated that Plaintiff is capable of performing her job of a cashier as generally performed in the national economy, which does not require lifting over twenty pounds. (R. 23). Defendant's post hoc rationalization does not excuse the ALJ's failure to address the issue. Because the ALJ failed to discuss or explain how she considered or resolved the issue of Plaintiff's prior work in a composite job, the Court cannot determine whether the ALJ correctly applied the law at step four. As such the decision of the ALJ is not supported by substantial evidence and must be reversed and remanded to determine whether Plaintiff's cashier and stock clerk position at Dean's Variety Mart was a composite job and, if so, whether Plaintiff has the residual functional capacity to perform the exertional demands of both components of the composite job and/or whether the Medical-Vocational Guidelines apply to Plaintiff's claim.

In addition, the undersigned finds that the ALJ's failure to consider whether Plaintiff's position was a composite job at step four is not harmless error. The ALJ erroneously divided Plaintiff's composite job into two jobs and then inappropriately found Plaintiff could perform the duties of the cashier duties at the light exertional level in order to find Plaintiff capable of performing her past relevant work. Further, the ALJ provided no explanation or analysis for why Plaintiff's position was not a composite job. Thus, the ALJ ended her analysis at step four and found Plaintiff to be not disabled based on finding Plaintiff could perform her past work as a cashier. By basing the ultimate finding of disability or an erroneous application of law at step four, the Court cannot conclude that such an error was harmless.

### 3. Whether the ALJ Properly Considered Plaintiff's Treating Source Opinion

Plaintiff argues that the ALJ improperly applied the treating physician's rule by failing to

specify the weight given to the state agency consultants and by improperly explaining her reasoning in assigning less weight to Dr. Kirk's opinion. (Pl.'s Br. 11-14). Defendant argues that the ALJ complied with the regulations in weighing Dr. Kirk's opinion and substantial evidence supports the ALJ's finding that Dr. Kirk's opinion was not entitled to significant weight because it was inconsistent with the state agency physician reports, the physical therapy treatment note and Dr. Kirk's own treating notes. (Def.'s Br. at 12-13).

As a general rule, the opinion of a treating physician will be given controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2); see also Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984); Heckler v. Campbell, 461 U.S. 458, 461 (1983). When not entitled to controlling weight, the medical opinion of a treating physician is still entitled to deference and must be weighed according to the following factors: 1) length of the treatment relationship and frequency of examinations, 2) nature and extent of the treatment relationship, 3) supportability, 4) consistency, and 5) specialization. 20 C.F.R. § 404.1527(d), 416.927(d); see also Heckler, 734 F.2d at 1015. When an ALJ does not give a treating source opinion controlling weight and denies benefits, the decision must contain "specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2; see also 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

### a. Whether the ALJ Properly Considered State Agency Physician Opinions

Here, there are two non-examining state agency consultant opinions in the record: a physical RFC assessment by Jill Lilly, a single decision maker, on August 29, 2011 (R. 65-72)

41

and a physical RFC assessment by a medical consultant, Dr. Subhash Gajendrafadkar, M.D., on October 5, 2011 (R. 293-300). Both Ms. Lilly and Dr. Gajendrafadkar limited Plaintiff to medium exertional work. (R. 66). These findings are contrary to Plaintiff's treating physician's opinion that Plaintiff must avoid prolonged standing or sitting and may lift up to ten pounds occasionally and five pounds frequently. (R. 281). In her decision, the ALJ stated in full that she "accepts the opinion of the state agency physician that the claimant is not disabled and able to perform work-related activities." (R. 23). The ALJ provided no explanation for her finding.

The Fourth Circuit has noted that a court "cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence." Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). Indeed, "[u]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Arnold v. Sec'y of Health, Ed. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977). Moreover, when there is a conflict in the medical opinion evidence, an ALJ is required to fully explain the weight given to each of the sources and the reasons for according such weight. See Gordon, 725 F.2d at 23; see also Moore v. Astrue, No. CIV. 3:08CV66, 2008 WL 4753754, at *4 (E.D. Va. Oct. 24, 2008) (explaining that "[i]f…the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d)").

While the ALJ was "unable to give Dr. Kirk's opinion significant weight," the ALJ failed to assign a weight to the state agency physician opinion. Rather than assign weight to the opinion

(i.e., great, significant, less than significant, little), the ALJ merely stated she "accepted" the state agency physician opinion. (R. 23). With no additional explanation, the undersigned is left wondering what weight was assigned and how the state agency physician opinion impacted the ALJ's ultimate RFC assessment. Because the state agency physician opinion is contrary to Plaintiff's treating source opinion, the need for the ALJ to assign a weight to the opinion and provide some explanation is of particular importance. By failing to assign a weight to the state agency physician opinion or provide an explanation, the undersigned finds that the ALJ erred in applying the Social Security rules regarding medical source opinions. Because the undersigned recommends reversing and remanding the case for the reasons stated above, the undersigned also recommends that on remand the Commissioner properly assign a weight and provide an explanation for the weight assigned to the state agency physician opinion.

### b. Whether the ALJ Properly Discounted Dr. Kirk's Opinion for being Inconsistent with the State Agency Physician Opinions, the Physical Therapy Treatment Notes and Dr. Kirk's Own Treatment Notes

The ALJ relied on three reasons in not giving Dr. Kirk's opinion significant weight: 1) his opinion is inconsistent with the state agency physician opinion; 2) his opinion is inconsistent with physical therapy records; and 3) his opinion is inconsistent with his own treatment notes. (R. 23). The Social Security Rules provide that "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 1527(d)(2); 20 C.F.R. § 416.927(d)(2); see also Trimmer v. Astrue, No. 3:10CV639, 2011 WL 4589998, at *4 (E.D. Va. Sept. 27, 2011), aff'd by 2011 WL 4574365 (E.D. VA. Sept. 30, 2011) ("[W]hen a physician offers specific restrictions or limitations…the ALJ must provide reasons for accepting or rejecting such opinions."). Moreover, "a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut

it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983). In addition, a logical nexus must exist between the weight accorded to opinion evidence and the record, and the reasons for assigning such weight must be "sufficiently articulated to permit meaningful judicial review." DeLoatch v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983). Based on a review of the record, the undersigned finds that the ALJ failed to provide sufficient reasons in according lesser weight to Dr. Kirk's medical opinion.

While the ALJ stated that Dr. Kirk's opinion is inconsistent with the state agency physician's opinion, she failed to point to any specific inconsistencies in the record or provide an explanation to allow the Court to follow her reasoning. As precedent has made clear, a court cannot affirm an ALJ's decision based upon post hoc reasoning. See Secs. & Exch. Comm'r v. Chenery, 332 U.S. 194, 196 (1947) ("[A] reviewing court…must judge the propriety of [agency] action solely on the grounds invoked by the agency."). As stated above, the ALJ failed to assign a weight to the state agency physician opinion. Then, the ALJ failed to provide an analysis explaining how the limitations found by Dr. Kirk are inconsistent with the findings of the state agency physician and/or why the state agency physician opinion is entitled to some greater weight. While it is the exclusive province of the ALJ to weigh the evidence contained in the record, the ALJ's findings cannot withstand judicial review when the ALJ fails to articulate her reasoning or substantiate her findings. See DeLoatch, 715 F.2d at 150. Here, the ALJ failed to provide any reasoning supporting her statement that Dr. Kirk's opinion was inconsistent with the state agency physician's opinion. Accordingly, substantial evidence does not support the ALJ's reason for discrediting Dr. Kirk's opinion.

Second, the ALJ stated that Dr. Kirk's opinion was inconsistent with the physical therapy records. However, the ALJ again failed to point to any evidence demonstrating such inconsistency. Instead, the ALJ has left the task to the Court to determine which physical therapy notes conflict with Dr. Kirk's opinion. As stated, above the undersigned will not comb through the record and engage in post hoc rationalization to identify the alleged inconsistencies between the Plaintiff's physical therapy notes and Dr. Kirk's opinion. Furthermore, at no point did the ALJ address any of the factors outlined in SSR 96-2p that are used to determine the weight given to a medical opinion. SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). Moreover, the undersigned's review of the record shows the ALJ's statement is not supported by substantial evidence. While Plaintiff's physical therapy notes show some instances of improvement, they also document continued pain and decreased range of motion. Accordingly, this reason for discrediting Dr. Kirk's opinion is also not supported by substantial evidence.

Third, the ALJ stated she did not assign significant weight to Dr. Kirk's opinion because it was inconsistent with his own treatment notes. In this instance, the ALJ provided an example of how Dr. Kirk's own treatment notes were inconsistent with his medical opinion. The ALJ explained that Dr. Kirk's notes from July 2011 state that "'the claimant's lumbar area was 'much better with no spasms.' Although he noted that her right SI joint still gave her pain, he reported that she had tried caring for a family member and had had difficulty with it." (R. 23). The ALJ's reliance on this treatment note as evidence that Plaintiff's condition improved in order to discredit Dr. Kirk's opinion that Plaintiff had a number of physical limitations is a mischaracterization of the record. For example, the ALJ ignored her own references to Dr. Kirk's treatment notes that indicate Plaintiff continued to report back pain and spasms after July 2011. (R. 20-21). Moreover, a review of Dr. Kirk's treatment notes as a whole indicate that Plaintiff

45

continued to report back pain despite treatment and physical therapy, her diagnoses of low back pain, right SI joint sprain and LS strain/sprain remained unchanged and she demonstrated reduced range of motion through September 24, 2012. (R. 350-51, 353, 356, 359, 343-47, 362-63). Furthermore, the ALJ failed to address any of the other factors set forth above when considering Dr. Kirk's opinion. Given these findings, the undersigned cannot conclude that substantial evidence supports the ALJ's assignment of weight to Dr. Kirk's opinion.

While there may be acceptable reasons in the record to discount Dr. Kirk's opinion, the ALJ failed to properly articulate such reasons. See Kratzer v. Astrue, No. 5:07CV00047, 2008 WL 936753, at *11 (W.D. Va. Apr. 8, 2008) (citing King v. Califano, 615 F.2d 1018, 1020 (4th Cir. 1980)) (explaining that "[i]t is well-settled that an ALJ may not reject medical evidence for no reason or for the wrong reason. Although he may, under the regulations, assign no or little weight to a medical opinion…he must explain his rationale, and it must be supported by the record."). Here, the ALJ failed to adequately explain her rationale in assigning lesser weight to Dr. Kirk's opinion and a review of the record shows that substantial evidence does not support the ALJ's finding. Because the undersigned recommends remanding the case for the reasons stated above, the Court further recommends that on remand the Commissioner reassess the weight and reasoning for the weight assigned to Plaintiff's treating source physician.

## VII. RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's application for Disability Insurance Benefits is not supported by substantial evidence. Accordingly, I **RECOMMEND** that Defendant's Motion for Summary Judgment (ECF No. 13) be **DENIED IN PART**, Plaintiff's Motion for Summary Judgment (ECF No. 11) be **GRANTED**

**IN PART** and the decision of the Commissioner be reversed and **REMANDED** for further action in accordance with this Recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 16th day of March, 2015.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE